UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN ASSOCIATION OF MOTORCYCLE INJURY LAWYERS, INC., ) | |
| ) | 20 C 4866 |
| Plaintiff, ) | |
| ) | Judge Gary Feinerman |
| vs. ) | |
| ) | |
| HP3 LAW, LLC, and HOWARD PIGGEE III, ) | |
| ) | |
| Defendants. ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

American Association of Motorcycle Injury Lawyers, Inc. ("AAMIL"), an association of

law firm members doing business as "LAW TIGERS," alleges in this suit that HP3 Law, LLC,

and its managing member, Howard Piggee III, violated the Lanham Act, 15 U.S.C. § 1051 *et*

*seq.*, and Illinois law by using the designation "TIGER LAW" and the domain name

"tigerlaw.com" in connection with their advertising and provision of legal services. Doc. 20.

Defendants move to dismiss the suit under Civil Rule 12(b)(6). Doc. 22. The motion is denied.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative

complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N.*

*Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred

to in it, and information that is subject to proper judicial notice," along with additional facts set

forth in AAMIL's brief opposing dismissal, so long as those additional facts "are consistent with

the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013)

(internal quotation marks omitted). The facts are set forth as favorably to AAMIL as those

1

materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth

those facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v.*

*United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A.    AAMIL's Services

AAMIL is an association of law firms across the United States doing business as

"Law Tigers." Doc. 20 at ¶ 14. On its website, www.lawtigers.com, AAMIL provides the

public with motorcycle accident resources, including material regarding accident prevention,

helmet laws, motorcyclist rights, insurance claims, and information about the legal process

involved in a typical motorcycle accident lawsuit. *Id*. at ¶ 17. AAMIL's website also hosts a

directory of lawyers who focus their practice on personal injury cases, including those involving

motorcycle accidents. *Id*. at ¶ 18.

Only lawyers who are "members" of AAMIL are listed on the directory. *Id*. at ¶ 19.

AAMIL grants each member "exclusive" membership rights to a certain geographic area,

meaning that the member is the only law firm listed for that area. *Id*. at ¶¶ 22, 25. AAMIL has

granted membership rights to a law firm with a membership area that encompasses Chicago. *Id*.

at ¶ 24. Potential clients who call Law Tigers from a primary residence in a membership area, or

who submit an inquiry through www.lawtigers.com and list a primary residence in a membership

area, are routed to the law firm with membership rights to that area. *Id*. at ¶ 23.

### B.    AAMIL's Trademarks

Since 2001, AAMIL has promoted its services under the trademark Law Tigers®. *Id*. at

¶ 26. AAMIL owns two federal registrations for the mark, each based on its use in interstate

commerce since at least January 2001. *Id*. at ¶¶ 29-30. The registrations give AAMIL the right

to use Law Tigers® in connection with its services, which are: (1) "[l]egal services, namely, legal

services, legal advisory services, provision of legal consultations, legal advice and representation

of others in legal matters, legal research, notary public services, and providing information in the field of personal injury and accident law," *id.* at ¶ 29; (2) "[a]ssociation services, namely, promoting the interests of lawyers who have an interest in personal injury and accident law[,] … promoting the interests of lawyers and law professionals[, and] … promoting the interests of motorcyclists and motorcycle drivers," *id.* at ¶ 30; and (3) "[b]usiness services, namely, providing a website featuring an interactive portal wherein potential clients can locate and contact lawyers," *ibid.*

AAMIL alleges that the Law Tigers® mark "is a well-known and famous symbol of AAMIL's [s]ervices among both United States law firms and the general consuming public of the United States as a designation of the source of the services of AAMIL and its members." *Id.* at ¶ 121. To support this allegation, AAMIL further alleges that:

- "AAMIL has exclusively and continuously promoted and used the LAW TIGERS® trademark for nearly 20 years."

- "AAMIL has members providing legal services across the United States and in approximately 42 designated markets, including in Illinois."

- "AAMIL has promoted the LAW TIGERS® network of legal service providers, motorcycle awareness, and accident safety nationwide through television and radio commercials, billboards, motorcycle magazine ads, motorcycle club newsletter ads, utilization of marketing managers to routinely visit motorcycle shops and set up and man displays at motorcycle events, motorcycle club/organization outreach, mobile billboards (*i.e.*, vehicle wraps), printed marketing materials/signage (teardrops, cut outs, flags, banners, etc.), search engine optimization, digital marketing, chat services and social media."

- "In 2019, AAMIL generated over $20 million in income through AAMIL memberships."

- "In 2019, AAMIL spent over $16.5 million on marketing campaigns for its members."

- "[There is a] high degree of actual recognition of the LAW TIGERS® mark among law firms and the general consuming public of the United States."

*Id.* at ¶¶ 116-121.

3

In addition to the Law Tigers® mark, AAMIL owns federal trademark registrations for various tiger images, slogans, and graphics, which it calls the "Tiger Image Marks." *Id*. at ¶ 31. Those marks, which AAMIL uses to identify its services, are based on their use in interstate commerce since at least January 1, 2001 or February 1, 2009. *Id*. at ¶¶ 34, 36, 38, 40, 42. AAMIL does not permit its members to use either the Tiger Image Marks or the Law Tigers® trademark to identify themselves or their services. *Id*. at ¶¶ 28, 32. Instead, AAMIL itself uses the marks to identify and advertise its members, and to provide the public with information about personal injury law and motorcycle accident legal services. *Ibid*.

### C.  The Alleged Infringement

HP3 Law provides legal services in the Chicago area. *Id*. at ¶ 3. Piggee is HP3 Law's manager and its sole owner, member, and attorney, and he "is solely responsible for directing the day-to-day operations and activities of HP3 [Law]." *Id*. at ¶¶ 5-6, 8. In around December 2012, Defendants began using the designation "TIGER LAW" to advertise and provide legal services in the AAMIL membership area encompassing Chicago. *Id*. at ¶¶ 44-45. On January 30, 2013, HP3 Law applied to the U.S. Patent and Trademark Office ("USPTO") for registration of "TIGER LAW" as a trademark for "legal services." *Id*. at ¶ 50. Piggee signed the trademark application in his capacity as HP3's "Manager." *Id*. at ¶ 51. The USPTO denied the application, citing the likelihood of consumer confusion between Defendants' proposed TIGER LAW designation and AAMIL's Law Tigers® registered trademark. *Id*. at ¶ 52. On June 12, 2014, HP3 again applied to the USPTO for registration of the TIGER LAW designation, this time for use in connection with "providing legal services in the field of real estate law, corporate law and business transactions law." *Id*. at ¶ 53. The USPTO denied that application on the same ground. *Ibid*.

Despite the USPTO's admonishment that TIGER LAW is "confusingly similar" to Law Tigers® when used in connection with legal services, Defendants persisted in using TIGER LAW and various tiger images to promote their legal services. *Id*. at ¶ 54. Moreover, Piggee registered, or directed the registration of, the domain name "www.tigerlaw.com" on July 24, 2014. *Id*. at ¶¶ 46-47. Defendants use the domain name www.tigerlaw.com in connection with their website, which features the name "TigerLaw" and several tiger images that promote HP3 Law's services. *Id*. at ¶ 48.

Defendants use TIGER LAW and www.tigerlaw.com with a "deliberate intent to profit from the Law Tigers® trademark and the Tiger Image Marks" by deceiving consumers as to the source of the advertised services. *Id*. at ¶ 77. As HP3 Law's manager and sole attorney, Piggee has had "willful, intentional, and personal involvement and sole decision-making authority regarding all of the [alleged infringing] activity." *Id*. at ¶ 8. Defendants' acts have "irreparably damaged the name, reputation and goodwill of AAMIL," "deprived AAMIL members of clients and potential clients in need of legal services," and prevented AAMIL from "us[ing] and control[ling] its own federally-registered trademarks as an Internet domain name." *Id*. at ¶¶ 78-80. Defendants have refused AAMIL's demands to stop using the TIGER LAW designation and to relinquish its control over the www.tigerlaw.com domain name. *Id*. at ¶¶ 70-74.

## Discussion

The operative complaint has seven counts: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (3) cybersquatting under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (4) trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c); (5) trademark dilution under the Illinois Trademark Registration and Protection Act, 765 ILCS 1036/65; (6) common law

5

unfair competition; and (7) deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*  Doc. 20 at ¶¶ 82-149.

## I.     Claims Against Piggee

Defendants argue that AAMIL's claims against Piggee should be dismissed because the complaint does not set forth grounds for holding him personally liable for HP3 Law's allegedly infringing conduct.  Doc. 22 at 13-14; Doc. 27 at 9-10.  The argument is unpersuasive.

Settled precedent holds that, "in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction."  *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926).  To make this "special showing" at the pleadings stage, and thus provide a basis for holding an officer "jointly [liable] with the company," a plaintiff must allege that the officer "act[ed] willfully and knowingly."  *Ibid.*; *see also C.S.B. Commodities, Inc. v. Urban Trend (HK) Ltd.*, 626 F. Supp. 2d 837, 856-57 (N.D. Ill. 2009) (citing cases applying the *Dangler* "special showing" requirement at the pleadings stage).  In the context of a patent infringement action, *Dangler* offered three non-exclusive circumstances in which an officer "acts willfully and knowingly": "[1] when [the officer] personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or [2] when [the officer] uses the corporation as an instrument to carry out his own willful and deliberate infringements, or [3] when [the officer] knowingly uses an irresponsible corporation with the purpose of avoiding personal liability."  11 F.2d at 947.  "*Dangler* is still the law of the Seventh Circuit and has been applied to trademark … cases."  *Peaceable Planet, Inc. v. Ty, Inc.*, 185 F. Supp. 2d 893, 896-97 (N.D. Ill. 2002) (citing cases).

The complaint alleges "willful and knowing" conduct by Piggee sufficient to satisfy the first and second scenarios set forth in *Dangler*.  Specifically, AAMIL alleges that Piggee is

HP3's managing member and its sole owner and lawyer, Doc. 20 at ¶¶ 5-6; that he "is solely responsible for directing the day-to-day operations and activities of HP3 [Law] and had willful, intentional, and personal involvement and sole decision-making authority regarding all of the [allegedly infringing] activity," *id*. at ¶ 8; and that he personally participated in the company's infringement by using TIGER LAW to advertise HP3 Law's services and "register[ing] or direct[ing] registration of the domain name tigerlaw.com" "[w]ith full knowledge of the LAW TIGERS® registered trademark," *id*. at ¶¶ 44, 46-49, 54; *see also id.* at ¶ 51 (alleging that Piggee signed HP3 Law's 2013 trademark application). The *Dangler* "special showing" requirement is satisfied under these circumstances, at least on a Rule 12(b)(6) motion. *See Callanetics Mgmt. Co., Inc. v. Pinckney*, 2013 WL 6507867, at *4 (N.D. Ill. Dec. 11, 2013) (holding that the "special showing" requirement was satisfied where the defendant officer allegedly was the corporation's president and sole employee, "personally authorized and directed the [allegedly infringing] activities," and "stood to benefit personally from [the] unauthorized use of the mark," adding that "it necessarily follows that [the officer] personally participated in the [corporation's] business decisions"); *Peaceable Planet, Inc.*, 185 F. Supp. 2d at 896-97 (denying dismissal where the defendant officer was the founder, president, CEO and sole shareholder of the corporation and allegedly oversaw the development, marketing and sales of the allegedly infringing product, personally participated in the product's design and naming, and approved and authorized the corporation's actions); *cf. Century 21 Real Est., LLC v. Destiny Real Estate Props.*, 2011 WL 6736060, at *7 (N.D. Ind. Dec. 19, 2011) (holding that the defendant officer could not be held personally liable for the corporation's infringement "absent allegations or proof of any facts that establish his personal involvement in the infringement, through control or approval of the company's acts").

Piggee retorts that he cannot be held liable for HP3 Law's alleged infringement because AAMIL does not allege that he "was acting outside of his official duties." Doc. 27 at 10. Granted, *Dangler* could be read to imply that officer liability may attach only when the officer "act[s] outside the scope of [his] official duties." *Dangler*, 11 F.2d at 946-47. But Seventh Circuit decisions applying *Dangler* make clear that an officer may be held individually liable even if he acted within the scope of his official duties. For example, in *General Motors Corp. v. Provus*, 100 F.2d 562 (7th Cir. 1938), the Seventh Circuit affirmed individual liability where there was evidence of "deliberate conduct on the part of the officers to use the corporation merely to carry on the infringing and unfair practices." *Id*. at 564. And in *Weller Manufacturing Co. v. Wen Products, Inc.*, 231 F.2d 795 (7th Cir. 1956), the Seventh Circuit held that a corporation's chief officer and manager may be personally liable for his corporation's patent infringement if he was "at all times in control of the administrative and managerial policy of the corporation." *Id*. at 801. Given the complaint's allegations, and under *General Motors* and *Weller Manufacturing*, AAMIL has stated viable claims against Piggie.

## II.     "Unlawful Use" Defense to all Claims

Defendants contend that AAMIL has no rights to enforce its marks because it has unlawfully used them in commerce by operating a for-profit client referral service in violation of Illinois law. Doc. 22 at 5-7; Doc. 27 at 3-4. Unlawful use in commerce is not among the enumerated defenses to trademark infringement set forth in 15 U.S.C. § 1115(b). Instead, unlawful use "has its origins in the common law doctrine of unclean hands," and serves as a "way of preventing the government from having to extend the benefits of trademark protection to a seller who violates [its] laws." *Dessert Beauty, Inc. v. Fox*, 617 F. Supp. 2d 185, 190-91 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also NYcityVAN, LLC v. Thomas*, 501 F. Supp. 3d 145, 148-49 (E.D.N.Y. 2020) (agreeing with *Dessert Beauty* and noting that the

unlawful use defense is recognized in the Ninth and Tenth Circuits); *Universal Mfg. Co. v. Douglas Press, Inc.*, 1992 WL 106822, at *2 (N.D. Ill. May 15, 1992) ("[C]ourts have barred plaintiffs from asserting their trademark rights where plaintiff's *uses* of their trademarks, as opposed to their conduct in obtaining them, were illegal.") (citing cases). Where recognized, unlawful use is an affirmative defense on which the alleged infringer "b[ears] the burden to plead and prove." *Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 349 (2d Cir. 1999) ("express[ing] no view regarding[] the merits of the [unlawful use] defense," but affirming the district court's denial of a party's "belated motion to amend [its] answer to add this defense"); *Universal Mfg. Co.*, 1992 WL 106822, at *2 (treating unlawful use in commerce as an "affirmative defense").

It is uncertain whether unlawful use is a valid defense to trademark infringement in the Seventh Circuit or under Illinois law. Even assuming the defense were appropriate in the Seventh Circuit, it is uncertain whether an alleged infringer may rely on a trademark owner's violation of *state* law to defend against a claim of *federal* trademark infringement. *See Leo Feist, Inc., v. Young*, 138 F.2d 972, 974-76 (7th Cir. 1943) (in a federal copyright suit, reversing the district court's allowing the defendant to assert an "unclean hands" defense based on the plaintiff's violation of a state licensing statute, reasoning that "the [state] statute is not to be interpreted as precluding enforcement of rights bestowed by federal law in the federal court"); *Universal Mfg. Co.*, 1992 WL 106822, at *2 (ruling that an unlawful use defense predicated on a state law violation may "reduce [the plaintiff's] recovery" under federal trademark law and "the scope of its equitable relief," but that it cannot "vitiate [the defendant's] liability"). The court need not run those questions to ground, for even if the unlawful use defense were available as to

some or all of AAMIL's claims, Defendants have not shown on the pleadings that AAMIL's use of its marks violates Illinois law.

Defendants' unlawful use defense is predicated on Illinois Rule of Professional Conduct 7.2(b)(2), which prohibits a lawyer from giving "anything of value to a person for recommending the lawyer's services," except for "the usual charges of a legal service plan or a not-for-profit lawyer referral service." Ill. R. Prof. Conduct 7.2(b)(2). Defendants contend that AAMIL runs a for-profit client referral service, in violation of Rule 7.2, in that it sells law firms "exclusive" membership rights to certain geographic areas and routes potential clients to the law firm with rights to the geographic area encompassing the potential client's location. Doc. 22 at 6-7; Doc. 27 at 5-6. AAMIL responds, among other things, that it does not operate a client referral service because it is not "recommending" lawyers within the meaning of Rule 7.2(b). Doc. 26 at 6-7.

As AAMIL notes, Comment 6 to Rule 7.2 defines a "lawyer referral service" as "any organization that *holds itself out* to the public as a lawyer referral service." Ill. R. Prof. Conduct 7.2, cmt. 6 (emphasis added). AAMIL submits that it does not "hold itself out" as a lawyer referral service because its website's home page expressly states that "Law Tigers does not endorse specific lawyers or function as a referral service … ." Doc. 26 at 7 (quoting Doc. 22-1 at 5). Defendants retort that an entity may not evade Rule 7.2 "simply by placing at the bottom of any advertising that would otherwise violate the rule that the offending entity is 'not a lawyer referral service.'" Doc. 27 at 6. But Defendants do not support their position with citation of any authority or further argument, thereby forfeiting the point for purposes of the motion to dismiss. *See Williams v. Bd. of Educ. of Chi.*, 982 F.3d 495, 511 (7th Cir. 2020) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived … .") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). In any

event, it would be a substantial leap to hold on the pleadings, without the benefit of an evidentiary record, that an organization stating on its website that "does not endorse specific lawyers or function as a referral service" in fact holds itself out as a lawyer referral service.

Accordingly, Defendants' across-the-board challenge to AAMIL's claims fails because, at least at this stage, they have not shown that their unlawful use defense applies to AAMIL's business and thereby defeats its claims. This holding does not foreclose Defendants from reasserting that defense at summary judgment or some other appropriate juncture.

## III. Challenges to Specific Claims

### A. Federal Trademark Dilution Claim

AAMIL claims that Defendants are liable for trademark dilution under 15 U.S.C. § 1125(c). Doc. 20 at ¶¶ 113-126. To state a dilution claim, AAMIL must allege: "(1) that the [LAW TIGERS®] mark is famous; (2) that [Defendants] adopted the mark after the mark became famous; (3) [Defendants] diluted the mark; and (4) [Defendants'] use is commercial and in commerce." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 811 (7th Cir. 2002) (citing 15 U.S.C. § 1125(c)(1)). Focusing on the first element, Defendants argue that AAMIL's dilution claim fails because LAW TIGERS® is not a "famous" mark. Doc. 22 at 9-11; Doc. 27 at 7-8. That argument fails at the pleading stage.

The Lanham Act provides that "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). The statute sets forth a non-exhaustive list of factors to be considered in deciding whether a mark is famous:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Ibid*.

The complaint sufficiently alleges that LAW TIGERS® is "famous" under these statutory criteria. Specifically, AAMIL alleges that it has used the LAW TIGERS® mark for nearly 20 years and in 42 markets across the United States; that it has promoted the mark in a wide variety of medium and marketing (on television, radio, billboards, magazine adds, newsletters, online, and on social media); that it generated over $20 million in income and spent over $16.5 million on marketing in 2019 alone; and that the mark has a "high degree of actual recognition" among "the general consuming public of the United States." Doc. 20 at ¶¶ 116-121. Given those allegations, the court cannot say on the pleadings that the LAW TIGERS® mark is not "famous." *See Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 773 (N.D. Ill. 2008) ("Given the factual inquiry necessary to determine whether a trademark is 'famous' for purposes of this Act, the court declines to make such a determination on a motion to dismiss[.]").

In pressing the contrary result, Defendants submit that LAW TIGERS® is at most "famous" among motorcyclists, as opposed to the general public, and that courts have "found advertising budgets and revenues many multiples of AAMIL's insufficient to maintain a dilution claim." Doc. 22 at 10 & n.4, 11; Doc. 27 at 7-8. These arguments may ultimately win the day on a complete record, but they cannot prevail as a matter of law on the pleadings. Most of the cases cited by Defendants were decided after a preliminary injunction hearing or on summary judgment, and the others resulted in dismissal because, unlike here, the plaintiffs' dilution claims were grounded in conclusory allegations of fame. *See, e.g.*, *Holding Co. of the Vills., Inc. v. Little John's Movers & Storage, Inc.*, 2017 WL 6319549, at *4 (M.D. Fla. Dec. 11, 2017)

12

("Although Holding Company generally alleges that the Marks are famous throughout Florida, the United States, and internationally 'as designators for the source of goods and services provided by Plaintiff and its affiliates,' and that the Marks 'are widely recognized by consumers,' these are conclusory allegations which are insufficient to support a dilution claim.") (citation omitted); *Brookwood Funding, LLC v. Avant Credit Corp., Inc.*, 2015 WL 11504556, at *4 (N.D. Ga. July 28, 2015) ("Other than general allegations that it has invested time and money into its mark, Plaintiff has not alleged any fact which would make it plausible that the Brookwood mark is 'famous' for the purposes of a federal dilution claim[].").

## IV.    State Law Claims

Defendants argue that the state law claims should be dismissed because AAMIL, an Arizona corporation, Doc. 20 at ¶ 1, cannot pursue those claims without first obtaining a certificate of business authority in Illinois.  Doc. 22 at 11-13; Doc. 27 at 8-9.  That argument fails as well.

The Illinois Business Corporation Act of 1983 ("IBCA") provides that "[n]o foreign corporation transacting business in this State without authority to do so is permitted to maintain a civil action in any court of this State, until the corporation obtains that authority."  805 ILCS 5/13.70(a).  An exception provides that corporations "engaged in only occasional and isolated transactions in Illinois," or that are "simply conducting interstate commerce," are "not required to obtain a certificate of authority."  *Subway Rests., Inc. v. Riggs*, 696 N.E.2d 733, 737 (Ill. App. 1998).  "It is the burden of … [D]efendant[s] to prove that [AAMIL] is doing business within [Illinois] according to the terms of the [IBCA]" and thus lacks the capacity to bring its state law claims.  *Vernon Co. v. Trimble*, 318 N.E.2d 666, 667 (Ill. App. 1974); *accord Career Concepts, Inc. v. Synergy, Inc.*, 865 N.E.2d 385, 392 (Ill. App. 2007).

Defendants contend that AAMIL is "transacting business" in Illinois because it has two "members" in the State and advertises on their behalf. Doc. 22 at 12-13; Doc. 27 at 9. AAMIL counters that its business in Illinois is "occasional and isolated" and therefore that it need not obtain a certificate of business authority to bring its state law claims. Doc. 26 at 13-14. AAMIL has the better of this argument.

In *Subway Restaurants, Inc. v. Riggs*, 696 N.E.2d 733, 737 (Ill. App. 1998), the court held that Subway Restaurants' business in Illinois—namely, "10 leasing transactions"—did "not constitute a substantial amount of business in Illinois" for purposes of the IBCA. Defendants do not show on the pleadings that AAMIL's two Illinois members and the unspecified amount of advertising it performs in the State are any more substantial than the ten leasing transactions in *Subway Restaurants*. *Cf. Se. Guar. Tr. Co. v. Rodman & Renshaw, Inc.*, 358 F. Supp. 1001, 1010 (N.D. Ill. 1973) (holding that the IBCA applied where the plaintiff "admit[ted] in its complaint that it conducts *all* of its business in Illinois and maintains an office [t]here for that purpose") (emphasis added). It follows that, at least at this stage, AAMIL may proceed with its state law claims despite not possessing a certificate of business authority.

## Conclusion

Defendants' motion to dismiss is denied. They shall answer the operative complaint by August 10, 2021.

July 20, 2021

_____
United States District Judge