UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN ASSOCIATION OF MOTORCYCLE INJURY LAWYERS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> HP3 LAW, LLC, and HOWARD PIGGEE III, <br><br> Defendants. | ) <br> ) <br> ) 20 C 4866 <br> ) <br> ) Judge Gary Feinerman <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION AND ORDER**

American Association of Motorcycle Injury Lawyers, Inc. ("AAMIL"), an association of law firms doing business as "LAW TIGERS," alleges that HP3 Law, LLC, and its managing member, Howard Piggee III (together, "HP3"), violated the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and Illinois law by using the designation "TIGER LAW" and the domain name "tigerlaw.com" in connection with their advertising and provision of legal services. Doc. 20. The court last year denied HP3's motion to dismiss. Docs. 41-42 (reported at 2021 WL 3054799 (N.D. Ill. July 20, 2021)).

In the wake of that ruling, familiarity with which is assumed, AAMIL moved for partial summary judgment as to liability on its Lanham Act trademark infringement and unfair competition claims, common law unfair competition claim, and Illinois Uniform Deceptive Trade Practices Act claim. Doc. 43. In opposing summary judgment, HP3 argues that there are genuine and material factual disputes concerning (1) the likelihood of confusion element of AAMIL's claims, (2) AAMIL's alleged fraudulent registration of its marks, and (3) AAMIL's alleged violation of federal and state franchise laws, Doc. 54, and HP3 seeks under Civil Rule 56(d) the chance to take discovery on those topics before AAMIL's summary judgment motion

1

is submitted for decision, Doc. 53. The third factual dispute identified by HP3 pertains to its sixth and seventh affirmative defenses, which allege that AAMIL's assertion of the marks is barred by the unclean hands doctrine. Doc. 52 at pp. 33-34. In response to HP3's Rule 56(d) request, AAMIL moves to strike the unclean hands affirmative defenses and seeks a protective order prohibiting certain discovery sought by HP3 from AAMIL and two of its members. Doc. 65.

AAMIL's motion to strike is considered first. HP3's sixth affirmative defense alleges that AAMIL's "use of the asserted marks is in violation of the Illinois Franchising Act, 815 ILCS 705/1 et seq.," in that it "has sold an unregistered franchise in which [it] provides use of the asserted marks in violation of 815 ILCS 705/5(1)." Doc. 52 at pp. 33-34. The seventh affirmative defense alleges that AAMIL's "use of the asserted marks is further in violation of 16 C.F.R. 436.1(g), as [it] is not registered as a franchise under the Federal Trade Commission Act[ and] has not provided its franchisees with the relevant documentation required under the Act." *Id*. at p. 34. The gist of the two unclean hands defenses is that AAMIL cannot assert the marks affirmatively in this suit because its use of the marks in commerce violates state and federal law. *See Dessert Beauty, Inc. v. Fox*, 617 F. Supp. 2d 185, 190-91 (S.D.N.Y. 2007) (noting that the unlawful use defense is akin to "the common law doctrine of unclean hands" and serves as a "way of preventing the government from having to extend the benefits of trademark protection to a seller who violates [its] laws") (internal quotation marks omitted); *Universal Mfg. Co. v. Douglas Press, Inc.*, 1992 WL 106822, at *2 (N.D. Ill. May 15, 1992) ("[C]ourts have barred plaintiffs from asserting their trademark rights where plaintiff's *uses* of their trademarks, as opposed to their conduct in obtaining them, were illegal.") (citing cases).

Unlawful use in commerce is not among the Lanham Act defenses set forth expressly in 15 U.S.C. § 1115(b). Rather, the defense arises from Trademark Trial and Appeal Board ("TTAB") rulings recognizing a "Patent and Trademark Office policy of refusing to recognize unlawful shipments in commerce as a basis for establishing rights in a trademark." *Satinine Societa in Nome Collettivo v. P.A.B. Produits*, 209 U.S.P.Q. (BNA) 958, 1981 WL 48126, at *6 (T.T.A.B. 1981).

As articulated by the TTAB, the unlawful use doctrine requires a "nexus between the use of the mark and the alleged violation." *General Mills, Inc. v. Health Valley Foods*, 24 U.S.P.Q.2d 1270, 1992 WL 296518, at *4 (T.T.A.B. 1992). The nexus requirement is met under two circumstances: (1) "when it is unlawful to ship the goods in commerce (either because any shipment is forbidden or because required prior approval was not obtained)"; and (2) "when the contents of the labelling, of which the mark is a part, are unlawful." *Satinine*, 1981 WL 48126, at *10 (Kera, concurring). In addition, the party asserting an unlawful use defense "must prove … that the non-compliance was material, that is, was of such gravity and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it could create no trademark rights." *General Mills*, 1992 WL 296518, at *3.

The Seventh Circuit has not spoken to the unlawful use defense, but two circuits have endorsed it. In *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219 (10th Cir. 2000), the defendant asserted that the trademark plaintiff had shipped fumigant without first acquiring a required EPA registration. *Id.* at 1225-26. The Tenth Circuit observed that there would be a "strong case" that rights in a mark should be revoked where the plaintiff ships the product unlawfully, but held that the defense was not triggered in that case because there was no evidence "tending to show [the registrant's] product was sold or distributed illegally." *Ibid*.

3

In *CreAgri, Inc. v. USANA Health Sciences, Inc.,* 474 F.3d 626 (9th Cir. 2007), the Ninth Circuit adopted the unlawful use defense, reasoning that (1) it would put the government in an "anomalous position" to uphold a seller's mark "based upon actions the seller took in violation of that government's own laws"; and (2) it would be bad policy to "give trademark priority to a seller who rushes to market without taking care to carefully comply with the relevant regulations." *Id*. at 630. Applying the defense, the court affirmed the district court's cancellation of the plaintiff's mark—which had appeared on the label affixed to a nutritional supplement—because the product's label did not comply with federal labeling requirements for supplements. *Id*. at 634. In so doing, the Ninth Circuit held that "the nexus between a misbranded product and that product's name, particularly one designed for human consumption, is sufficiently close to justify withholding trademark protection for that name until and unless the misbranding is cured." *Id*. at 631-32. By contrast, in *Southern California Darts Association v. Zaffina*, 762 F.3d 921 (9th Cir. 2014), the Ninth Circuit held that the trademark plaintiff's failure to pay taxes did not meet the unlawful use defense's nexus or materiality requirements because that "misconduct [is] unrelated to the purpose of the federal trademark laws and, therefore, collateral and immaterial." *Id*. at 931-32.

The Ninth and Tenth Circuits' applications of the unlawful use defense adhere to its TTAB roots. In *CreAgri* and *United Phosphorus*, the plaintiffs' alleged violations of federal law involved an unlawfully shipped product or a product sold with an unlawful label, thus satisfying the nexus requirement. *See Satinine*, 1981 WL 48126, at *10 (Kera, concurring) ("As a general proposition … a registration should be refused or cancelled when it is unlawful to ship the goods in commerce (either because any shipment is forbidden or because required prior approval was not obtained) or when the contents of the labelling, of which the mark is a part, are unlawful.").

The materiality requirement was satisfied as well, as the violations were "of such gravity and significance that the usage must be considered unlawful—so tainted that, as a matter of law, it could create no trademark rights." *General Mills*, 1992 WL 296518, at *3. And in *Southern California Darts*, the plaintiff's tax law violations were too tangential and immaterial to the trademark laws to support an unlawful use defense.

AAMIL's alleged franchise law violations are far more akin to the tax law violations in *Southern California Darts* than to the labeling and shipping violations in *CreAgri* and *United Phosphorus*. As in *Southern California Darts*, AAMIL's alleged violations have no connection to the unlawful shipment or mislabeling of trademarked goods, thus failing to satisfy the nexus requirement. *See Satinine*, 1981 WL 48126, at *10 (Kera, concurring). AAMIL's alleged violations also fail to satisfy the materiality requirement. The franchise laws cited by HP3 require franchisors to disclose certain information to franchisees, *see* 815 ILCS 705/16; 16 C.F.R. §§ 436.2-.6, and are designed "to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered for sale," 815 ILCS 705/2. *See also* Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunities, 72 Fed. Reg. 15444, 15448 (March 30, 2007) (describing 16 C.F.R. § 436 as mandating the "presale disclosure of material information necessary to make an informed purchasing decision"). While those franchise disclosure requirements are not "purely technical in nature," AAMIL's alleged failure to comply is not of "such gravity and significance" as to "taint[]" its use of the Law Tigers marks such that, "as a matter of law, it could create no trademark rights." *General Mills*, 1992 WL 296518, at *3. Thus, HP3 does not have a viable unlawful use defense.

Moreover, the TTAB has held that it should "hold a use in commerce unlawful only when the issue of compliance has previously been determined (with a finding of noncompliance) by a court or government agency having competent jurisdiction under the statute involved, or where there has been a per se violation of a statute regulating the sale of a party's goods." *Ibid*. Here, no court or government agency of competent jurisdiction has previously determined that AAMIL violated federal or state franchising laws, and AAMIL has not committed a per se violation of those laws. True enough, the Ninth and Tenth Circuits do not mention this limitation on the unlawful use doctrine, and TTAB opinions do not bind federal courts. But because the doctrine arises from TTAB rulings, this circumstance provides another reason why HP3's defense fails. *See Buti v. Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir. 1998) ("[T]he decisions of the TTAB, while not binding on [federal] courts … are nonetheless to be accorded great weight.") (internal quotation marks omitted).

Accordingly, AAMIL's motion to strike HP3's unclean hands affirmative defenses is granted. It necessarily follows that HP3 is not entitled under Rule 56(d) to take discovery on the third factual dispute it identifies in opposing summary judgment—whether AAMIL has violated federal and state franchise laws—and that AAMIL is entitled to a protective order against such discovery, including discovery on whether it operates as a franchise.

A different result obtains for the first and second factual disputes identified by HP3. The first dispute concerns the likelihood of confusion element of AAMIL's claims, and HP3 seeks to depose AAMIL (via Rule 30(b)(6)) and its CEO on the "services provided to consumers," the "standard of care on the part of AAMIL's customers," "actual confusion," and "the strength of [AAMIL's] mark." Doc. 53 at 2. Those matters are relevant to the likelihood of confusion element of AAMIL's Lanham Act claims. *See Packman v. Chi. Trib. Co.*, 267 F.3d 628, 643

6

(7th Cir. 2001) (holding that "area and manner of concurrent use, "degree of care likely to be exercised by consumers," "strength of the plaintiff's mark, and "actual confusion," among other considerations, factor into the likelihood of confusion analysis). HP3 therefore may take discovery from AAMIL on those topics.

The second factual dispute concerns AAMIL's alleged fraudulent registration of its marks. That dispute implicates HP3's fifth affirmative defense—which alleges that AAMIL's marks are "invalid based upon fraudulent procurement" because, "at the time that it filed its applications for the [marks], [it] was aware that it had not used the [marks] on or before the first dates asserted in its applications," Doc. 52 at p. 33—and second counterclaim—which alleges that AAMIL's marks are unenforceable because its trademark application fraudulently represented that it was providing legal services, despite its knowledge that the "Rules of Professional Conduct" prohibited it from doing so, *id*. at pp. 36-38. HP3 is entitled to discovery on the fraudulent registration issue—including "the nature of the services provided [by AAMIL] in 2001," Doc. 53 at 2—because it pertains to that affirmative defense and counterclaim. *See United States v. Farley*, 11 F.3d 1385, 1390 (7th Cir. 1993) (noting that Rule 26 "contemplate[s] broad discovery, permitting discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," and stating that "discovery relevant to any … affirmative defense[]" is permissible under Rule 26) (internal quotation marks and alterations omitted).

Accordingly, HP3's Rule 56(d) request is granted, and AAMIL's motion for a protective order is denied, insofar as HP3 seeks discovery from AAMIL on topics related to the likelihood of confusion analysis and AAMIL's alleged fraudulent registration of its marks.

7

Finally, AAMIL moves to quash the subpoenas that HP3 served on two of its members. Doc. 65 at 17-19; Doc. 65-1 at 1-15 (the subpoenas). Rule 45 provides that the court "must quash or modify a subpoena that[] … subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). In conducting that analysis, the court must determine whether "the burden of compliance with [the subpoena] would exceed the benefit of production of the material sought by it." *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004); *see also Martin v. United States*, 2015 WL 7783516, at *2 (C.D. Ill. Dec. 3, 2015) ("[W]here discovery is sought from a non-party, the court should be particularly sensitive when weighing the probative value of the information sought against the burden of production on the non-party."); *Little v. JB Pritzker for Governor*, 2020 WL 1939358, at *2 (N.D. Ill. Apr. 22, 2020) (similar) (collecting cases).

The subpoenas are quashed insofar as they pertain to the franchise issues implicated by HP3's now-stricken unclean hands affirmative defenses. That leaves three other general areas covered by the subpoenas: (1) the care used by clients in selecting an AAMIL member firm to represent them; (2) actual confusion between AAMIL and HP3; and (3) the money that AAMIL and its members spend on advertising. Doc. 70 at 15-16.

As to the first area, HP3 argues that the following examination topics and document requests are relevant to consumer care: (a) "[h]ow prospects are received by [AAMIL members] from the www.lawtigers.com website and 1-800-LAW-TIGERS" (examination topic 11 and document requests 9 and 12); and (b) "The process of converting a prospect received through the www.lawtigers.com website and 1-800-LAW-TIGERS into a client" (examination topic 12 and document request 13). *Id*. at 15; Doc. 65-1 at 6, 8, 13, 15. As noted, the "degree of care likely to be exercised by consumers" is one factor in the likelihood of confusion analysis. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). And as AAMIL acknowledges, Doc. 71 at 18,

HP3's inquiries into AAMIL members' processes for receiving prospects from AAMIL and converting them into clients could reveal information about the extent to which clients negotiate with AAMIL members during the intake process. *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 682 (7th Cir. 2001) (noting that the fact that consumers "decide to buy only after extensive negotiations" indicates that it is likely that consumers exercise a high degree of care). In addition, the burden on the AAMIL members of providing that information is not high, as the issue is narrow and a topic with which members are already familiar. Thus, HP3 may seek discovery from the subpoenaed AAMIL members on those examination topics and document requests.

The parties have reached agreements rendering the subpoenas moot as they pertain to the second and third areas. On the subject of actual confusion, HP3 offered to withdraw its subpoena topics if AAMIL stipulated that its members "are not aware of any instances of potential confusion not already known to AAMIL and [HP3]," Doc. 70 at 16 n.7, and AAMIL has agreed to so stipulate, Doc. 71 at 18. On the subject of the amount of money that AAMIL and its members spend on advertising, that issue is "relevant to [AAMIL's] dilution and cybersquatting claims," Doc. 70 at 16, which AAMIL has voluntarily dismissed, Doc. 71 at 19. Accordingly, the subpoenas are quashed to the extent they relate to actual confusion and advertising expenditures.

\* \* \*

AAMIL's motion to strike HP3's unclean hands affirmative defenses is granted. Because HP3 is entitled under Rule 56(d) to seek further discovery from AAMIL regarding the likelihood of confusion analysis and its alleged fraudulent procurement of the marks, and from the two subpoenaed AAMIL members regarding the process for receiving prospects and converting them

9

to clients, AAMIL's summary judgment motion is denied without prejudice to renewal on a more complete record, HP3's Rule 56(d) request is granted in part and denied in part, and AAMIL's motion for a protective order is granted in part and denied in part. AAMIL's trademark dilution and cybersquatting claims (Counts III, IV, and V of the operative complaint, Doc. 20) are dismissed.

February 8, 2022

_____
United States District Judge